|  |  |
|---|---|
| **D.S. AND S.S. ON BEHALF OF S.S.,**<br><br>Plaintiffs,<br><br>v.<br><br>**PARSIPPANY TROY HILLS BOARD OF EDUCATION,**<br><br>Defendant. | Civ. No. 17-9484 (KM) (MAH)<br><br>**OPINION** |

## KEVIN MCNULTY, U.S.D.J.:

This case is an appeal from a decision by Administrative Law Judge ("ALJ") Kelly J. Kirk, dated June 20, 2017. The ALJ's opinion centers around a May 19, 2016 Individualized Education Plan ("IEP") prepared by Defendant Troy Hills Board of Education (the "District") for a minor child named SS who was in the process of transferring into the district from out of state. (ALJ Record, 118–133). SS's parents, plaintiffs S.S. (Ms. S) and D.S. (Mr. S) claim that the District failed to provide SS, their son, with a free and appropriate public education ("FAPE") in the least restrictive environment, as required by the Individuals with Disabilities Education Act ("IDEA"). They unilaterally placed SS in private school in New Jersey and then sought reimbursement for his tuition charges. The District moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment affirming the ALJ's decision. The Parents move for summary judgment reversing the ALJ's decision.

For the reasons set forth below, I will **GRANT** the District's motion and **DENY** the Parents' motion.

## I.   Background[1]

### A. Factual History

The ALJ's findings of fact are as follows:

SS was born in April 2010. (ALJ Op. 2). In 2012, SS was diagnosed with autism spectrum disorder ("ASD"). (*Id.*). From August 2012 to February 2016, SS attended Mitchell's Place, a private school in Alabama, where the family then resided. (*Id.*). Mitchell's Place developed an IEP for SS for the school year running from August 2015 to August 2016. (*Id.*). Later, the District would rely on the Mitchell's Place IEP as a basis for development of their own IEP for SS (ALJ Op. 52).

---

[1]     Unless otherwise noted, all citations to the ALJ Op. refer to undisputed facts. As discussed in Section II(a), *infra*, the ALJ's factual findings are considered *prima facie* correct, and I accept the ALJ's credibility determinations unless the extrinsic evidence in the record would justify a contrary conclusion.

For ease of reference, certain key items from the record will be abbreviated as follows:

| "DSF" | = | The District's statement of facts | [DE 15-4] |
| "PSF" | = | The Parents' statement of facts | [DE 19, 7–13] |
| "PR" | = | The Parents's Response | [DE 23-3] |
| "ALJ Op." | = | The Administrative Law Judge Opinion | [DE 19-4] |
| "P-[no.]" | = | The Parents' submitted ALJ Record | [DE 8] |
| "R- [no.]" | = | The District's submitted ALJ Record | [DE 8-1] |

Both parties have provided an exhibit list of the ALJ Record. (DE 15-3); (DE 26-1; DE 27-1). The District's list includes page number references to the ALJ record. (DE 15-3; DE 26-1). The Parents have attached copies of the exhibits they cite. (DE 27–30).

| "1T" | = | January 17, 2017 Transcript | [DE 8-4] |
| "2T" | = | January 18, 2017 Transcript | [DE 8-5] |
| "3T" | = | March 27, 2017 Transcript | [DE 8-6] |
| "4T" | = | April 18, 2017 Transcript | [DE 8-7] |
| "MP IEP" | = | Mitchell's Place IEP | [DE 8-1, 33–55] |

On November 6, 2015, via e-mail, Ms. S introduced herself to Anthony Giordano, the Director of Special Services for the District. She told Giordano that her family was considering relocating to New Jersey in the spring. (ALJ Op. 3–4 (citing R-27)). Ms. S informed Giordano that her family was in the initial phase of looking for school districts that would best meet the needs of her five-year-old son, who had an ASD diagnosis. (Id.). She asked to set up a phone call with Giordano. (Id.).

In mid-November, 2015, Giordano and Ms. S spoke on the phone. (Id.). Following up on the phone call, Ms. S sent Giordano a brief narrative from Nicole Mishkin, MAE, BCBA, at Mitchell's Place (the "Mitchell's Place Narrative") to explain SS's current status. (ALJ Op. 4 (citing R-27). The narrative reflects that Mitchell's Place had encountered challenges in attempting to implement SS's recent programming. (Id.).

On November 17, 2015, Ms. S e-mailed Giordano thanking him for calling her back. She stated in the e-mail:

> I can not thank you enough for calling me back this morning. I feel so much confident about our upcoming move to your area. I look forward to speaking with your ABA Therapist when she connects with me. I have looked at your school calendar and will likely plan a week long trip there prior to Spring Break. I will keep you posted or connect with any questions that pop up. Thanks for serving with passion!

(ALJ Op. 5 (citing R-28)).

For two days, January 5–6, 2016, SS attended the BACA Atlas Clinic ("BACA") in Indiana. (ALJ Op. 5). BACA did not complete a VB-MAPP assessment of SS, but certain components were tested and the Intraverbal Subtest was conducted. (ALJ Op. 5 (citing P-1)).

On February 18, 2016, Ms. S. and Giordano met at Giordano's office. (ALJ Op. 6). On February 26, 2016, Ms. S e-mailed Giordano the following:

> I can not thank you enough for taking time to meet with me last week to let me know what Parsippany has to offer. We are still in the process of transitioning there from Alabama. I hope our paths cross again REALLY soon. Your fire, energy and passion are so evident and your students are so fortunate to have you on their team.

(ALJ Op. 6 (citing R-31)).

On March 2, 2016, Ms. S e-mailed Giordano the following:

I am thrilled that we are in the process of finalizing a lease agreement for Parsippany. Please let me know where I can start the process of enrolling? The lease should be finalized by Friday, after the three day waiting period. I would like to get the ball rolling before the weekend. We will be in the area March 25-29th and moving there for good Mid-April. I would like the March visit to encompass any visits we need to make in advance of placement. We have a narrative of his barriers from his current BCBA that was written for an outside consultant BACA of Indianapolis. The team at BACA included Dr. Sundberg who's [sic] brother developed the VBMAPP. We could offer that as well.

(ALJ Op. 7 (citing R-32)). On March 4, 2016, Giordano replied and requested Ms. S's address so that he could mail her the preschool packet. (Id.). Giordano advised that Ms. S could contact the school to make an appointment to have SS meet with the Child Study Team ("CST") once the family had a lease. (ALJ Op. 7). In her reply, Ms. S informed Giordano that the family was still hammering out the lease, but she provided the potential address. (Id.). Ms. S also informed Giordano that SS would turn six in April. (ALJ Op. 7(citing R-32)).

On March 13, 2016, Ms. S e-mailed Giordano and Denise Basile, Giordano's secretary, to say that she had not received the packet. (ALJ Op. 7). Basile gave Ms. S the contact information for the school that would serve the family's anticipated New Jersey address. (ALJ Op. 7 (citing R-33). Ms. S inquired about how to receive the packets so she could have them filled out prior to registration within a few weeks. (Id.).

Basile replied that, because SS would be turning six in April, Ms. S would need to register SS for first grade. (Id.). She directed Ms. S that she could download the registration forms online. (Id.). For further registration information, Basile instructed SS to contact the school secretary. (Id.).

On March 15, 2016, via e-mail, Ms. S identified herself to Donna Martinez at the District and thanked Martinez for taking her call the day

4

before. (ALJ Op. 7). To this e-mail, Ms. S attached the following documents: (1) the Mitchell's Place IEP for the 2015-2016 school year, (2) SS's July 2015 VB-MAPP results, (3) an activity-based teaching checklist; and (4) SS's current tacting list. (*Id.* (citing R-34)). In a second e-mail, Ms. S sent: (1) the Mitchell's Place Narrative, (2) the BACA Report, and (3) a redacted copy of the Parents' lease in Parsippany. (ALJ Op. 8 (citing R-35)). Ms. S also told Martinez that the family hoped to register and meet with the District staff on March 28 or March 29. (*Id.*). Martinez thanked Ms. S in response to the first e-mail. (*Id.*).

On March 22, 2016, via e-mail, Ms. S asked if it would be possible to enroll her son March 21 or March 22.[2] (ALJ Op. 8 (citing R-36)). Inadvertently, Martinez replied to Ms. S that she did not know what to do with SS's registration and that she had given everyone all of the information. (*Id.*).

On that same day, March 22, 2006, SS began attending Milestones Behavior Group, Inc. ("Milestones") in Alabama. (ALJ Op. 9 (citing R-50). That enrollment lasted approximately one month.

On March 24, 2016, Martinez informed Ms. S that she had forwarded Ms. S's e-mail to everyone that needed access, but had yet to hear back from CST. (ALJ Op. 9). Martinez advised Ms. S to contact CST. (*Id.*).

On March 31, 2016, Ms. S e-mailed Vicky Chomut, MSW, LCSW, a school social worker for the District. (ALJ Op. 3 (citing R-17)). In that email, Ms. S thanked Chomut for meeting with her the day before "for an impromptu conversation." (ALJ Op. 9). Ms. S informed Chomut that the family had looked up the schools on the list that Chomut had written for them, two of them being "Epic" and "Garden." (*Id.*). Ms. S stated that she looked forward to meeting with Chomut in the upcoming weeks to visit other schools and do an evaluation, if necessary. (ALJ Op. 10).

On April 3, 2016, Ms. S sent Chomut an e-mail, attaching a 2015 occupational therapy evaluation and an interdisciplinary evaluation and

---

[2]    These dates do not appear to line up, but the ALJ accurately reported them from the relevant exhibit (R-36).

treatment planning report from Mitchell's Place. (ALJ Op. 10 (citing R-39)). Ms. S also offered to send a neurological report. (Id.). Ms. S stated that, in the upcoming weeks, she would like to visit to look at schools and complete enrollment. (Id.).

On April 4, 2016, Chomut requested the neurological report and informed Ms. S that she had forwarded the information to her colleagues on the CST. (ALJ Op. 10). Mom sent the report and requested the names of the other CST members. (Id.). On April 4, 2016, Ms. S emailed Chomut an occupational therapy discharge summary from Mitchell's Place. (ALJ Op. 10 (citing R-41)). Ms. S advised that she did not have a summary for speech because they had pulled SS from that program to focus on ABA during the transition. (ALJ Op. 10).

On April 5, 2016, Ms. S e-mailed Chomut (1) the BACA Report, (2) the Mitchell's Place Narrative, and (3) a CST administrator access letter. (ALJ Op. 10–11 (citing R-42)). Ms. S informed Chomut that they were available on April 21 or April 22 for morning evaluations and school visits. (ALJ Op. 11 (citing R-42)).

On April 6, 2016, Ms. S e-mailed Chomut the list of schools that she was interested in. (ALJ Op. 11 (citing R-43)).

On April 11, 2016, Milestones prepared a Behavior Intervention Plan and Skill Acquisition Program for SS (ALJ Op. 11 (citing R-50)).

On April 14, 2016, Ms. S asked Chomut for an update on school visits and SS's evaluations. (ALJ Op. 11). On April 19, 2016, Ms. S informed Chomut that she had scheduled an additional meeting with Alpine Learning Group ("Alpine"). Ms. S requested that Chomut would confirm that Alpine had SS's records and send the agenda for April 21 and April 22. (ALJ Op. 11–12 (citing R-4; R-45; P-18)). Chomut replied with an update on the scheduled tours and informed Ms. S that she would be happy to send SS's records to Alpine. (ALJ Op. 12). Chomut also stated that "the Team is looking forward to evaluation SS for necessary eligibility documentation on Thursday 4/21 at 10 am." (Id. (citing

R-4, P-18). On April 20, 2016, Chomut e-mailed Ms. S the final appointments at schools. (ALJ Op. 12 (citing R-45)).

On April 21, 2016, Ms. S e-mailed Giordano informing him that she had "hit a wall with the school enrollment process." (ALJ Op. 13). Ms. S informed Giordano that the family had arrived at the testing site for evaluations that morning, but had been told that SS could not be evaluated. Ms. S asked Mr. Giordano what the family needed to do and advised that, to her knowledge, they had completed all necessary paperwork. (Id.). In reply, Giordano informed Ms. S that the evaluations could not be done in one day and that CST needed to meet and review all documentation. (Id.). Mr. Giordano instructed Ms. S to wait to hear from him or a supervisor. (Id.).

Ms. S forwarded Giordano's response to Chomut and stated:

Please see below. I thought it was an one hour evaluation. Not sure what is going on with the process. I have been asked to wait to hear from Mr. Giordano. I appreciate you going the extra mile and will wait to hear from you all. I will honor the appointments tomorrow. Please send contact names, if you can. Obviously this turn of events is incredibly disappointing, but we will adjust.

(ALJ Op. 13 (citing R-46)).

On April 21, 2016, an Initial Planning Meeting was held, with Mr. S and Johanna Greco ("Greco"), MA, LDT-C, a member of the CST (ALJ Op. 3 (citing R-20)), in attendance. (ALJ Op. 13 (citing R-5)). The District then proposed to conduct an educational evaluation and psychological evaluation. (ALJ Op. 13 (citing R-6)).

On the same day, Mr. S signed an authorization for the CST to exchange verbal and written confidential information with Milestones. (ALJ Op. 13–14 (citing R-7)).

On April 22, 2016, Ms. S e-mailed Ms. Chomut:

We have decided to head home. I think it's best if someone is with me on the visit and that we are on pace to be enrolled so that we can manage our expectations. Please let me know if I need to cancel them.

(ALJ Op. 14 (citing R-47)). Chomut replied and suggested that if Ms. S was still in New Jersey, the two should speak. (Id.). Ms. S asked Chomut to let her know what other paperwork was needed because Ms. S would be leaving for Alabama the following Friday. (Id.).

On April 27, 2016, Ms. S e-mailed Giordano, asking if there was an update on SS's registration and if he needed any more information. (ALJ Op. 14 (citing R-48)). The family, Ms. S further informed Giordano, would be in New Jersey permanently starting the following weekend. (Id.). Giordano replied that someone from CST would reach out to her. (ALJ Op. 14 (citing R-48). On April 28, 2016, Ms. S advised Giordano that the family was now scheduled for meetings. (Id.).

April 28, 2016 was SS's last day at Milestones. (ALJ Op. 14 (citing R-50). He had been there for just over one month.

SS was officially registered in the District on April 30, 2016. (ALJ Op. 14). In their statement of undisputed facts, the Parents assert that "the parents registered SS as a student with the [District] on *March 30, 2016* and gave the [D]istrict all of the relevant documentation required for registration via email correspondence." (DE 19 ¶ 10 (citing R-34; R-35; R-39). In support, the Parents cite Ms. S's testimony that she and her husband officially registered their son at the school on March 30, 2016. (PR ¶ 46 (citing T4 205). In reviewing this issue, I must defer to the ALJ's credibility determinations unless contradicted by non-testimonial evidence.

As non-testimonial evidence of the date of registration, the Parents cite to several e-mails from Ms. S. to representatives of the District in which Ms. S provides the District with SS's documentation for enrollment. (PSF ¶ 10 (citing "R-34" (DE 8-1 at 189); "R-35" (DE 8-1 at 219); "R-39" (DE 8-1 at 257)). Nothing within those e-mails or their attachments overcomes the ALJ's finding that SS was registered on April 30, 2016. (see ALJ Op. 15). In fact, the cited email of April 3, 2016 from Ms. S. to Chomut (R-39, DE 8-1 at 257), appears to contradict the Parents' position. In that e-mail, Ms. S states "I would like to

visit on a Thursday and/or Friday in the upcoming weeks to look at schools and *complete enrollment.*" (*Id.*) (emphasis added). Thus, at least as of April 3, 2016, the Parents were still in the process of completing enrollment of their son with the District. There is not sufficient extrinsic evidence to overcome the ALJ's finding that the date of SS's registration was April 30, 2016.[3]

On May 5, 2016, Ms. S signed authorization forms for the CST to exchange verbal and written confidential information about SS with several New Jersey schools. (ALJ Op. 14–15). Ms. S also signed an authorization form for "out of district school per CST suggestions or parent(s) requests." (ALJ Op. 15 (citing R-7)).

That same day, Susan Landesberg, M.S., conducted SS's psychological evaluation. (ALJ Op. 15 (citing R-8)).

On May 8, 2016, Ms. S e-mailed Greco to thank her for visiting her home. (ALJ Op. 16 (citing R-49). Ms. S also discussed out-of-district schools and the factors she was using in deciding on one. (*Id.*).

On May 9, 2016, Chomut performed a social assessment. The following day, Chomut documented that assessment in a report. (ALJ Op. 16 (citing R-9).

On May 12, 2016, Greco performed an educational evaluation. (ALJ Op. 17). The next day, Greco documented that evaluation in a report. (ALJ Op. 17 (citing R-10)).

On May 19, 2016, Landesberg asked Ms. S for a neurological report with diagnosis. SS's initial diagnosis was not from a psychiatrist, Ms. S informed Landesberg, but from a psychologist. (ALJ Op. 17 (citing R-52)).

The same day, May 19, 2016, Greco e-mailed Ms. S a copy of the educational evaluation. (ALJ Op. 17 (citing R-53)).

Also on May 19, 2016, an initial eligibility determination with IEP meeting was held. (ALJ Op. 17 (citing R-12)). The draft IEP reflects SS's

---

[3]     Although the Parents make frequent reference to this issue, they do not seem to employ it as the basis for any legal argument. At any rate, the point is moot, because I uphold the ALJ's factual finding that the registration date was April 30, not March 30, 2016.

proposed placement for May 23, 2016, to June 23, 2016, and for September 6, 2016, to June 23, 2017, as Special Class Autism with an individual personal aide daily for 390 minutes. (ALJ Op. 17).

On that same day, Ms. S e-mailed Greco thanking her for an informative meeting. (ALJ Op. 18). Ms. S also requested an electronic copy of the evaluation, if that had not already been done, and the Draft IEP. (ALJ Op. 18 (citing R-54).

On May 20, 2016, Greco e-mailed Ms. S the Draft IEP and advised that they would continue to make changes to the document until placement was finalized. (Id.).

In their statement of undisputed facts, the Parents assert that the Draft IEP (R-12) had no goals and objectives and was missing the social assessment (R-9). (DE 19 ¶18). I agree with the Parents that the Draft IEP lacked goals and objectives and the social assessment. (R-12). Both, however, are incorporated in the *revised* IEP. (R-13). The Parents note that the social worker, Chomut, was not present at the IEP meeting, and the record bears them out. (Id.). Chomut was present, however, at the May 24, 2016 meeting discussed *infra.* (ALJ Op. 25).

On May 24, 2016, the family took a tour of the District's program at Rockaway Meadow school and then met with the staff for a meeting. (ALJ Op. 18). That same day, Ms. S e-mailed Greco, Chomut, and Landesberg, and asked them to send the revised IEP that was discussed in that meeting (here called the "Final IEP"). (ALJ Op. 18 (citing R-55)). On May 25, 2016, Martinez e-mailed District employees and copied Ms. S, among others. (ALJ Op. 18–19). That e-mail stated that the Parents observed the District's autistic program the day before and that a draft IEP had been developed. (Id.). In addition, the e-mail discussed what programs SS would be attending, his registration location, and transportation arrangements. (Id.). In addition, the e-mail stated the following:

The ABLLS-R (The Adaptive Language and Learning Scale- Revised) will be administered when he begins the program and teachers and therapists can then provide summaries and goals developed from the assessment. Susan Landesberg (Case Manager from Troy Hills) will be at Rockaway Meadow on June 1st along with Vicky Reinhard (Social Worker-Rockaway Meadow). Please feel free to contact if there are any concerns.

(Id.).

In their statement of undisputed facts, the Parents assert that, at the Rockaway Meadow meeting, there was no BCBA present to explain the program or why it was appropriate for SS (PSF ¶ 20 (4T 213:1–214:25). The ALJ, however, accepted Chomut's testimony that she, Landesberg, Greco, Nancy Heisler, the Rockaway Middle School psychologist in charge of the autism program, and an unnamed behaviorist attended that meeting with Ms. S. (ALJ Op. 25).[4]

Second, the Parents assert that, without discussion, the District informed Ms. S that SS would be enrolled in Occupational Therapy and Speech Therapy. The Parents do not provide a citation to the record to support this assertion. The Parents state that they informed the District that they had discontinued those services in Alabama because they were not effective, but that the District prescribed those services in New Jersey without performing an evaluation. Again, there is no citation to the record.[5]

Finally, the Parents assert that the District personnel were unable to articulate the qualifications of SS's one-to-one paraprofessional. (DE 19 ¶ 21 (citing 4T 215: 4–216: 9)). The ALJ considered Ms. S's testimony regarding the District's paraprofessionals. (ALJ Op. 45). However, the ALJ determined that Ms. S's criticisms were based on her perception that programs such as SEARCH hire personnel with more advanced credentials. The ALJ found "no

---

[4]     As discussed in Section III.A.8, infra, the District was not required to provide an expert at the IEP meeting.

[5]   As discussed in Section IIIA.2 and 8, infra, the District's initial reliance on the Mitchell's Place IEP to create SS's programing was proper, and the Parents' unilateral placement of SS at SEARCH, a private school, denied the District the opportunity to complete their evaluations.

evidence," however, "that there are particular educational requirements not met by the paraprofessionals at Rockaway Meadow School." (ALJ Op. 54). The Parents have not presented adequate extrinsic evidence to overcome that finding of the ALJ.

On May 25, 2016, Landesberg e-mailed Ms. S a copy of the Final IEP. (ALJ Op. 19). In that e-mail, Landesberg explained that the dates of the Final IEP would run from June 1, 2016 and expire May 19, 2017 (one year from the initial meeting). (*Id.*). Landesberg also advised that teachers and behaviorists would be able to meet with the Parents or provide programs directly into the Final IEP. (*Id.* (citing R-57; R-8)). The meaning of this is somewhat unclear.

On May 26, 2016, Landesberg e-mailed Ms. S that, because she had not heard back from Ms. S, Landesberg assumed that she would meet SS at school when the bus arrived that Wednesday. (ALJ Op. 19). Landesberg requested that if there were any changes, Ms. S should contact her by cell phone. (ALJ Op. 19).

The Final IEP reflects SS's proposed placement for (1) June 1, 2016 to June 23, 2016 and (2) September 7, 2016 to May 19, 2017. (ALJ Op. 19 (citing R-13)). SS's proposed placement was Special Class Autism with a personal aide daily for 390 minutes, and special transportation via bus with an attendant from July 1, 2016 to May 19, 2017. (*Id.*). The final IEP also includes occupational therapy once a week for 20 minutes and speech-language therapy two times a week for twenty minutes. (*Id.*). For the period between July 1, 2016 and July 29, 2016 (the "extended school year"), SS was placed as Special Class Autism with an individual personal aide daily for 240 minutes, occupational therapy once a week for fifteen minutes, and speech-language therapy once a week for twenty minutes. (*Id.*).

On May 26, 2016, the Parents signed an Agreement for service for SEARCH Consulting, LLC ("SEARCH") in Mountainside, New Jersey. (ALJ Op. 19). On that same date, the Parents' attorney (1) requested that the District's attorney provide her with SS's data as well correspondence regarding SS;

(2) notified the District that the Parents intended to unilaterally place SS at SEARCH; and (3) requested referrals to several out-of-district schools. (ALJ Op. 19–20 (citing R-59)).

During the period following that unilateral placement, the District did not convene any further meetings with the Parents to discuss the Parents' concerns.[6]

On June 1, 2016, Chomut e-mailed Ms. S a draft copy of SS's social assessment and asked Ms. S if she thought any corrections or additions should be noted. (ALJ Op. 20 (citing R-60).

In their statement of undisputed facts, the Parents state that the social assessment was not complete because, until that point, it did not contain all history and parental input. (PSF ¶ 18, 24 (citing R-9, R-60)). The social assessment states that "[l]ater [SS] was privately evaluated at the Autism Research Institute and the Alpine Institute by Autism Specialists who recommended that [SS] would best be serviced academically through strict top tier intensive ABA programs that exclusively used discrete trial, e.g. Epic, Garden Academy, Alpine." (R-9, 6). The Parents do not cite to code or case law to support the implication that the social assessment was not final until after the Final IEP was prepared. At any rate, as discussed *infra*, the ALJ found that the overall IEP and evaluation process, which was still ongoing, had been cut short by SS's unilateral placement at SEARCH.

On June 6, 2016, SS began attending SEARCH. (ALJ Op. 20). Over the first two weeks of SS's attendance, SEARCH conducted the VB-MAPP. (*Id.* (citing P-2). SEARCH is not a New Jersey State-Approved school. (*Id.*).

---

[6]     This fact, too, appears in the Parents' statement of undisputed facts without a citation to the record. (PSF ¶ 23). The District, however, concedes that it is accurate. (DR ¶ 23).

### B. The ALJ Appeal

On June 22, 2016, the Parents filed a request for due process review with the State Office of Special Education. (ALJ Op. 3). On July 14, 2016, the District filed an answer. (*Id.*). The matter was filed with the Office of Administrative Law on August 11, 2016. (*Id.*).

The ALJ thoroughly reviewed the record and held a hearing commencing on January 17, 2017 (*see* transcript 1T). The hearing continued on January 18 (2T), March 27 (3T), and April 18, 2017 (4T). (*Id.*). The ALJ heard the testimony of eight witnesses. For the Parents, the ALJ heard (1) Carrie Kahana, MA, BCBA, (ALJ Op. 32–33); (2) Katherine DeCotiis Wiedemann, MA, BCBA, (ALJ Op. 33–38); (3) David W. Sidener, Ph.D., BCBA-D (ALJ Op. 39–42); and (4) Ms. S (ALJ Op. 42–47). For the District, the ALJ heard (1) Anthony Giordano (ALJ Op. 22–23); (2) Victoria Chomut, MSW, LCSW (ALJ Op. 23–26); (3) Johanna Greco, MA, LDT-C (ALJ Op. 26–28); and (4) Heather Pane, MA, BCBA (ALJ Op. 28–32).

Written summations were submitted for a final hearing date, June 20, 2017. (ALJ Op. 3).

### C. The ALJ's Decision

In her written decision, after correctly articulating the governing legal standards, the ALJ addressed the IDEA claims: (1) alleged procedural violations at the District level; (2) alleged inappropriateness of the District's IEP; and (3) the reasonableness of the Parents' unilateral placement of SS at SEARCH, a private school program.

First, the ALJ concluded that the District's alleged procedural violations did not deprive SS of a FAPE. At the outset, the ALJ summarized the timeline of District's IEP process and stated that "the extensive record supports that the District made a good-faith effort to comply with applicable laws." (ALJ Op. 50). The ALJ then considered the Parents' arguments. (*Id.*).[7] The ALJ determined

---

[7]    The ALJ addressed the Parents' concerns with Mitchell's Place and their preference to not use the Mitchell's Place IEP. The ALJ considered the IEP meeting, including the fact that no one at the IEP meeting may have specifically asked for

that, even though the District's BCBA had not yet evaluated SS, the District's CST had adequate training and information to determine that SS needed an ABA program and to place him in the District's program. (ALJ Op. 50 – 51). The ALJ highlighted that testing would be conducted at the start of SS's program. (Id.). The District's program, the ALJ noted, was not inconsistent with SS's prior placements. (ALJ Op. 51).

Next, the ALJ determined that the District's IEP was appropriate to meet SS's educational needs and reasonably calculated to provide SS with a FAPE. To reach that conclusion, the ALJ first analyzed the contents of the IEP, and determined that the IEP reflects SS's ABA needs. (ALJ Op. 52–53). The ALJ then addressed each of the Parents' arguments,[8] but found those arguments wanting.[9] Particularly, the ALJ was not persuaded that the District's program was not an ABA program. (ALJ Op. 56). The ALJ determined that the record reflects that SS was provided an ABA program—and, as required by law, the District relied on SS's prior programming until the District could conduct further evaluations. (Id.). Considering SS's particular circumstances, the ALJ

---

parental input. The ALJ also weighed the draft IEP, the revised IEP, and the fact that Ms. S did not instruct the school that she was unable to open the revised IEP. (ALJ Op. 51). The ALJ also considered the Parents' criticisms regarding speech and occupational therapy. (ALJ Op. 52).

Deciding in favor of the District, the ALJ gave particular note to Pane's testimony. (ALJ Op. 51). According to the ALJ, Pane's testimony reflected that she: (1) had reviewed SS's prior IEP and interdisciplinary report; (2) understood that SS's maladaptive behaviors needed to be addressed; and (3) instructed another BCBA to both assist in preparing the IEP and include a notation stating that an FBA would be conducted. (Id.). Moreover, Pane testified that the frequency and duration of one-to-one services were not included in the IEP because those services are part of the District's program. (Id.).

[8]       To address the Parents' arguments, the ALJ discussed: (1) the testimony of the Parents' witnesses, Wiedemann and Sidener; (2) the BACA report; (3) and the testimony of District's witness, Pane. (ALJ Op. 53–54).

[9]       Among other considerations, the ALJ especially credited Pane's testimony that: (1) the ABLLS-R would be conducted and (2) the IEP would be revised pursuant to the results of the ALBBS-R and the FBA. (ALJ Op. 53).

15

noted that the happenstance of a child's moving to New Jersey shortly before the end of the school year should not dictate an out-of-district placement. (*Id.*).

Finally, because the District IEP was appropriate and reasonably calculated to provide a FAPE, the ALJ concluded that it was not reasonable for the Parents to unilaterally place SS at SEARCH. (ALJ Op. 57). To support that conclusion, the ALJ also considered the Parents' final interactions with the District (or lack thereof). (*Id.*).

For those reasons, the ALJ denied the Parents' requested relief and dismissed their petition of appeal. (ALJ Op. 57–58).

This action, challenging the ALJ's decision, followed. The Parents sought relief under the IDEA and 29 U.S.C.A. § 794(a). The Parents subsequently dropped their claim under 29 U.S.C.A. § 794(a), and only the IDEA claim remains on this appeal. (DE 23, 21). This Court has jurisdiction pursuant to 20 U.S.C. § 1415(i)(2) and 28 U.S.C. § 1331.

## II. IDEA and Standard of Review

### A. The IDEA statutory scheme

The federal  Individuals with Disabilities Education Act ("IDEA") requires states receiving federal education funding, such as New Jersey, to ensure that students with disabilities[10] receive a "free appropriate public education that emphasizes special education and related services designated to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1); *see also Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 425–26 (3d Cir. 2013). A state satisfies its duty to provide a free appropriate public education ("FAPE") by providing "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel.*

---

[10]     A child with a disability is a child with "intellectual disabilities, hearing impairments . . . speech or language impairments, visual impairments . . . health impairments, or specific learning disabilities, . . . who, by reason thereof, needs special education and related services." 20 U.S.C. § 1401(3).

*Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017); *see also K.D. by & through Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248 (3d Cir. 2018).

States are obligated to provide children with disabilities special education with an individualized education program ("IEP"). *See* 20 U.S.C. § 1414(d). "An appropriate IEP must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 65 (3d Cir. 2010). In New Jersey, the IEP is developed by a school district's Child Study Team, which is composed of "a school psychologist, a learning disabilities teacher-consultant, and a school social worker—along with the student's parent(s) or guardian(s), a teacher familiar with the student, and other specified school personnel." *M.C.I. on behalf of M.I. v. N. Hunterdon-Voorhees Reg'l High Sch. Bd. of Educ.*, No. CV 17-1887, 2018 WL 902265, at *1 (D.N.J. Feb. 15, 2018 (citing N.J.A.C. 6A:14-2.3(k)(2); 20 U.S.C.A. § 1414(d)(1)(B)). "As was the case here, a parent who disagrees with a school district's proposed IEP may challenge the IEP in a due process hearing, which is adjudicated by an ALJ." N.J.A.C. 6A: 14-2.7; *Lascari v. Bd. of Educ.*, 560 A.2d 1180, 1183–84 (N.J. 1989).

To determine liability for violations of the IDEA, the court undertakes a two-fold inquiry: "(1) Has the school district complied with the procedures set forth in IDEA?; and (2) Has the school district fulfilled its obligation to provide the student with a FAPE?" *D.B. v. Gloucester Twp. Sch. Dist.*, 489 F. App'x 564, 566 (3d Cir. 2012). A procedural violation is deemed a denial of a FAPE when the violation causes substantive harm to the child or the child's parents. *Id.*

### B. This Court's Standard of Review

The Parents and the District have made mirror-image summary judgment motions. "[W]hen there is no new evidence presented to the district court, as in this case, a motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *M.A. v. Voorhees Twp. Bd. of Educ.*, 202 F.Supp.2d 345, 359 (D.N.J.2002) (internal quotations and citations omitted), *aff'd*, 65 F. App'x 404 (3d Cir. 2003).[11]

"In cases arising under the IDEA, we apply a modified *de novo* standard of review, giving due weight and deference to the findings in the administrative proceedings." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012) (quoting P.*P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 734 (3d Cir.2009)). A reviewing court must "accept the state agency's credibility determinations unless the nontestimonial, extrinsic evidence in the record would justify a contrary conclusion." *Id.* (internal quotations and citations omitted). Conclusions of law are given plenary review. *Id.* Factual findings, such as whether a school district fulfilled its FAPE obligations, are reviewed for clear error. *Id.* Such ALJ findings "are to be considered prima facie correct, and if [a court does] not adhere to those findings, [it] must explain why." *Id.* (internal citations omitted).

---

[11] Such review, although denominated as a motion for summary judgment, is not an ordinary Rule 56 motion, but is more akin to an appeal. The court has noted the distinction between IDEA review of the administrative record and an ordinary motion for summary judgment thus:

> Because the IDEA requires a district court to grant a judgment on the record based on its own ascertainment of the preponderance of the evidence, many IDEA claims do not fit into the typical summary judgment standard of "no genuine issues of material fact."

*D.B. ex rel. H.B. v. Gloucester Twp. Sch. Dist.*, 751 F. Supp. 2d 764, 769 (D.N.J. 2010), *aff'd*, 489 F. App'x 564 (3d Cir. 2012).

As in the case of a standard summary judgment motion, however, this Court is not required to adopt statements of fact not supported by the record. The failure to cite to the record is a recurring problem in the Parents' briefing. I have nevertheless reviewed the record in an effort to locate such support as may be available.

"[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) (internal quotations and citations omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574.

All of that said, the reviewing court cannot merely defer to the ALJ. A district court "does not use the substantial evidence standard typically applied in the review of administrative agency decisions, but instead must decide independently whether the requirements of the IDEA are met." *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757 (3d Cir.1995) (internal quotation and citation omitted). The party seeking relief or challenging the administrative decision bears the burden of persuasion. *D.K.*, 696 F.3d at 243 (citations omitted).

## III. Discussion

In support of their position that the ALJ Opinion should be overturned, the Parents make three broad arguments: (A) the ALJ failed to appropriately apply the law; (B) the ALJ failed to make appropriate findings of fact and credibility; and (C) the ALJ was biased against the Parents and in favor of the District. For the reasons set forth below, I deny each argument.

### A. ALJ's application of the law

The Parents argue that, throughout the decision, the ALJ "misapplied the IDEA, relevant case law, and the New Jersey Administrative Code." (DE 19, 21). The Parents have set forth alleged instances in which the ALJ misapplied the law. The following subsections treat these topics: (1) the FAPE standard; (2) the transferee District's reliance on the IEP of a prior private school; (3) consideration of a District's good faith efforts; (4) the burden of proof; (5) appropriateness of accepting testimony that the proposed IEP would be reviewed in 30 days, after testing; (6) comparisons between schools; (7) a prior opinion by the same ALJ; and (8) alleged procedural violations.

19

### 1. FAPE standard

The Parents argue that the ALJ failed to consider and properly apply the FAPE standard as it was established in *Endrew F. v. Douglas County School District*, 137 S. Ct. 988 (2017). (DE 19, 21–24). *Endrew F.* held that IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 1001. Instead of citing to *Endrew F.*, the ALJ applied the Third Circuit's long-established standard: "a satisfactory IEP must provide 'significant learning' and confer 'meaningful benefit." (ALJ Op. 48–49 (citing *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 578 (2000)). The Parents' argument is essentially that *Endrew F.* heightened the FAPE standard previously announced by the U.S. Court of Appeals for the Third Circuit. The Third Circuit itself, however, recently held to the contrary. The language of *Endrew F.*, wrote the Court of Appeals, "*mirrors our longstanding formulation*: the educational program "must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential and individual abilities." *K.D. by & through Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 254 (3d Cir. 2018) (emphasis added). Because *Endrew F.* did not change this Circuit's standard, I cannot fault the ALJ for relying on pre-*Endrew* Third Circuit case law.

In addition, the Parents rely on the following dicta in *Endrew F.*: "An IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." 137 S. Ct. at 999. That language, they say, implies that the IEP needed to be complete and final, with nothing more to be done, *before* SS started school in the District. (*See* DE 19, 22 (citing *Endrew F.*)). The quoted language, however, does not state or imply that a district must develop a finalized IEP for an out-of-state transfer student before that district has had the opportunity to test the child.

## 2. Transfer from Alabama private school

The Parents raise a number of objections to the District's reliance on an IEP that was developed, not by a transferor public school district, but by a private school, Mitchell's Place, where SS was enrolled in Alabama.

There is a prescribed process for developing an IEP for a transfer student who has an IEP from a prior public school district:

> When a student with a disability transfers from an out-of-state school district to a New Jersey school district, the district CST shall conduct an immediate review of the evaluation information and the IEP and, without delay, in consultation with the student's parents, **provide a program comparable to that set forth in the student's current IEP until a new IEP is implemented** . . . [T]he appropriate school district staff shall conduct any assessments determined necessary, and within 30 days of the date the student enrolls in the district, develop and implement a new IEP for the student.

N.J.A.C. 6A:14-4.1(g) (emphasis added) (cited at ALJ Op. 49–50); *see also* 20 U.S.C. § 1414(d)(2)(C)(i)(II).

A slightly different but parallel procedure applies where a student transfers in from a *private* school with some sort of services plan in place:

> [A]ppropriate school district staff shall conduct an immediate review of the services plan and shall provide **comparable services pending completion of any necessary assessments and, as appropriate, the development of an IEP for the student.** An IEP for the student shall be in place within 60 calendar days from the date of enrollment in the school district.

N.J.A.C. 6A:14-4.1(m) (emphasis added).

SS's case does not quite fit under either category. As the ALJ noted, he transferred in from a private school, where an IEP, designated as such, was already in place. Under either regulation, however, the transferee district is admonished to maintain the regime that was in place at the prior school while a new IEP is being developed. A period of 30 or 60 days is contemplated for development of an IEP in the destination district. And either way, the transferee district must at a minimum take the student's prior evaluations and programming into account in designing an IEP. *See* N.J.A.C. 6A:14-2.5(a)(1)

(requiring that a district conducting an evaluation shall use a variety of information, including information "[p]rovided by the parent that may assist in determining whether a child is a student with a disability and in determining the content of the student's IEP"); *see also* 20 U.S.C. § 1414(b)(2)(A).

The ALJ seems to have cited and applied the procedures of N.J.A.C. 6A:14-4.1(g), at least as a stopgap while the local district develops its own IEP. Given that Mitchell's Place had developed an IEP, designated as such, that approach was sound. But even under the alternative procedures of N.J.A.C. 6A:14-4.1(m), *supra*, the District was empowered to treat the Mitchell's Place IEP as a basis for action while it developed a new, local IEP.

Embedded in the Parents' factual summary, but not raised as separate points of argument, are several objections to the adequacy of the IEP developed by Mitchell's Place. I discuss them here.

First, the Parents object that the Mitchell's Place IEP was not developed by a public school district, and was a mere "form document developed by Mitchell's Place as a 'guide' for parents." (PR ¶ 13). It may be that no Alabama public school district developed the IEP; Ms. S testified to that effect (ALJ Op. 42), although there was no further evidence as to the Alabama IEP's origin. The statement that the Mitchell's Place document was a mere "form," as opposed to a plan developed with SS in mind, is likewise not cited to the record, and appears to contradict internal evidence in the IEP itself. Among other components, the Mitchell's Place IEP includes categorized descriptions of SS's present level of achievement, categorized annual goals and benchmarks for SS, and details of SS's special education services. (MP IEP).

Second, the Parents object that Ms. S instructed the District that the Mitchell's Place IEP was not to be followed, but only used for informational purposes. (*Id.*). The significance is not wholly clear, but in any event this statement, too, is not cited to the record. Nor does IDEA grant parents any such power to prescribe what will be considered and for what purpose.

Third, the Parents argue that the Mitchell's Place IEP was not current, and that Ms. S e-mailed the District that it "ha[d] been revamped."[12] (*Id.* (citing R-34); PR ¶ 44)). That circumstance did not go unnoticed by the ALJ; the ALJ specifically listed the "current IEP from Mitchell's Place (which Mom noted had been revamped)." (ALJ Op. 7) The ALJ nevertheless permissibly concluded that the District was entitled to use the Mitchell's Place IEP as an initial foundation for its own IEP. *See* Section III.A.8.

Fourth, the Parents assert that the Mitchell's Place IEP and VB-MAPP results were not reliable because Mitchell's Place began to experience difficulties with SS's program very shortly after it was developed. (PR ¶¶ 14, 18 (citing R-35)). The ALJ did not ignore the experience at Mitchell's Place, however, but considered it in her opinion (ALJ Op. 4 (noting the areas of concern raised by the Mitchell's Place narrative)). Again, the ALJ took this concern into account when she validly found that the District was entitled to rely on the Mitchell's Place IEP. *See* Section III.A.8.

Fifth, the Parents assert that the Mitchell's Place IEP was generally unsatisfactory. Ms. S testified that she discussed her concerns about Mitchell's Place with the school social worker, Vicky Chomut. (PSF ¶ 19 (citing P-18 (citing T4 176: 24 –177:19)); *see also* PSF ¶ 6) ("The [P]arents were concerned with SS's progress at Mitchell's Place and the Mitchell's Place staff told the [P]arents that they could not get SS's behavior under control." (citing R-3)). Here too, the ALJ considered the Parents' concerns with Mitchell's Place (*see, e.g.*, ALJ Op. 51) (noting that "the parents were not happy with Mitchell's Place"). Again, the ALJ did not ignore these concerns, but took them into account in the course of concluding that the District was entitled to rely on the Mitchell's Place IEP, at least while it was developing its own IEP. *See also* Section III.A.8.

---

[12]     The meaning of "revamped" is unclear. The Parents may not have meant that Mitchell's Place subsequently updated the IEP. This may be a rephrasing of their preference for the later material developed during SS's one-month stay at Milestones. *See* "Sixth" at p. 23, infra.

Sixth, the Parents assert that the District should not have adopted the Mitchell's Place IEP at all, but instead should have instituted an intensive ABA program "similar to what [SS] was getting in Alabama at Milestones." (ALJ Op. 55). SS attended Milestones, a private program, for approximately one month, from March 22 to April 28, 2016, while the Parents were simultaneously in the process of enrolling SS in the New Jersey school district. The ALJ found the Parents' approach unreasonable:

> While there may exist other schools that exclusively utilize BCBAs or utilize higher levels of education for staff than the District, or that require greater oversight, this does not render the District's program inappropriate, and there was no testimony that the duration of time or staff levels of education in the District were in violation of any ABA program requirements.

(*Id.*).

The Parents' approach, the ALJ wrote, would create the "untenable possibility that parents could enroll their child in any program for a short duration prior to a move and a new school district would thereafter be required to provide a comparable program." (*Id.*). The ALJ rejected the notion that the program in place during SS's brief sojourn at Milestones created an entitlement. (ALJ Op. 55–56).

I agree that parents cannot, by means of a one-month private school buy-in, lock in a particular set of procedures and thereby bind the destination District. The District is required to provide an appropriate public education, evaluated on its own merits, not to equal or top some other program the parents have found.

### 3. Good faith effort

The Parents make the broad assertion that the ALJ let the District off easy when she wrote that it "made a good-faith effort to comply with the applicable laws." (DE 19, 21 (citing ALJ Op. 50). What is required, say the Parents, is compliance, not a good-faith effort.

I agree, but as discussed in Section III.A.1, the ALJ did apply the appropriate standard. This Court hears appeals from ALJ decisions, not ALJ comments.[13] In any event, the ALJ's comment seems to have been limited to her conclusion that despite all efforts, the District was unable to complete the process because the parents unilaterally placed SS at SEARCH. The idea that the District discharged its obligation by trying is a misrepresentation of what the ALJ meant.

In that respect, this case is similar to *P.C. ex rel. J.C. v. Harding Twp. Bd. of Educ.*, No. CIV. 2:11-06443 WJM, 2013 WL 3938969 (D.N.J. July 31, 2013). In *Harding*, the ALJ Opinion denied a FAPE challenge, explaining that the district had made a "good faith effort" to complete the student's IEP, but the student's parents cut those efforts short by not allowing the district to test their child. *Id.* at *6. Upon review, the district court noted two of the ALJ's findings: (1) that the district was working to complete the student's IEP by the beginning of the school year and (2) that the district intended to finalize an IEP with goals and objectives shortly after the student started school. *Id.* at *9. Because the student's parents had "short-circuited the process," the court could not say "whether the finalized IEP would have resulted in a loss of educational opportunity or would have caused a deprivation of educational benefits." *Id.*

Here, too, the ALJ referred to a "good-faith effort" in the context of a finding that the Parents short-circuited the process. It did not state or imply

---

[13] To be fair, the Parents' argument is itself more in the nature of a comment. It appears in the Parents' introduction to the section on the ALJ's application of the law, but is never discussed. (DE 19, 21 (citing ALJ Op. 50)).

that a district discharges its burden by putting forth a good faith effort. The ALJ's comment was a recognition that because the Parents' unilateral placement of SS cut off the District's opportunity to test SS, what was left for the ALJ to review was not, and could not be, final.

### 4. Burden of proof

Next, I address the Parents' argument that the ALJ improperly placed the burden of proof on the Parents, instead of on the District. (DE 19, 33–34 (citing N.J.S.A. § 18A:46-1.1)). The ALJ was surely aware of the allocation of the burden; the Opinion correctly states at the outset that, at the due process hearing, the District bears the burden of proof and production. (ALJ Op. 49 (citing N.J.S.A. § 18A:46-1.1 ("Whenever a due process hearing is held pursuant to the provisions of the [IDEA] . . . the school district shall have the burden of proof and the burden of production.")). Even so, the Parents argue, the ALJ misapplied that burden. (DE 19, 33-34).

The Parents overstate considerably in arguing that the ALJ "cites to nothing the district did to justify that the IEP was appropriate as written." (DE 19, 34). For example, the ALJ found that the District's IEP was in fact an ABA program, citing ample internal evidence.[14] The ALJ ruled that "until the District could conduct further evaluations, some of his programming was dictated by his prior programming." (ALJ Op. 52–53, 56). As the ALJ noted, the District had not yet had the opportunity to conduct ABLLS-R testing and a Functional Behavior Assessment (FBA). (ALJ Op. 53). The ALJ credited Pane's testimony that the IEP would be revised as appropriate in light of the results of such

---

[14] [T]he IEP reflects that [SS] "requires direct intervention and the use of ABA techniques and programs to address development of the skills needed to learn." Although the Special Considerations section of the· IEP should reflect that he has communication needs and that his behavior impedes his learning or that of others, those are obvious considerations in educating a child diagnosed with autism, and those considerations are noted elsewhere in the IEP including in the summaries of the most recent evaluations. Additionally, among the goals and objectives in the IEP are several relating to manding and tacting, which are ABA terms.

(ALJ Op. 53 (R-13)).

testing. (*Id.*) Absent convincing extrinsic evidence to the contrary, I accept the ALJ's factual findings.

Two findings of fact, say the Parents, nevertheless demonstrate that the ALJ improperly placed the burden on them.

The first is this: The ALJ found that the District IEP, if permitted to go forward, would have placed SS in the autistic classroom and required an ABA program. (ALJ Op. 54). The ALJ wrote that the Parents' proposed evidence "fell short of establishing that the proposed IEP and program did not have the necessary elements of ABA." (DE 19, 33 (citing ALJ Op. 54)). This does not represent a shifting of the burden. Rather, the ALJ made a determination that the District had met its burden. In the course of doing so, she properly considered and discussed the strength of the contrary evidence submitted by the Parents.

The second allegedly problematic finding is this: The ALJ determined that "the evidence did not establish that the District's IEP was not reasonably calculated to provide SS with meaningful educational benefit or an appropriate education." (DE 19, 34 (citing ALJ Op. 56)). Throughout the opinion, the ALJ indicated that the District had satisfied its burden to prove that the IEP provided this transfer student with a FAPE.[15]

Addressing and rejecting the Parents' evidence and counter-arguments did not "shift the burden" to them. Indeed, it might have constituted error not to do so. I am satisfied that the ALJ understood the burden of proof and applied it properly.

---

[15]    The ALJ found that the IEP reflects that SS requires an ABA program, includes SS's previous IEP, and includes all District evaluations that could have been conducted up until SS started the program. (ALJ Op. 50–51, 52–53).

### 5. *Lascari*/statement that IEP would be revised in 30 days

Next, I consider the Parents' argument that the ALJ violated *Lascari v. Board of Education*, 116 N.J. 30 (1989). The upshot of the Parents' *Lascari* argument is that the ALJ improperly relied on Ms. Pane's testimony that the IEP would be revised after thirty days. (DE 19, 25–26).

In *Lascari*, a school district created an IEP for a child before he was newly enrolled in the district. *Lascari*, 116 N.J. 30, 37 (1989). That IEP was created based on the evaluations of the child-study team, *id.* at 37, and was implemented for an academic year. *Id.* at 38. The IEP was a blatant failure—it included only five broad goals and placed that neurologically impaired child in a classroom for the perceptually impaired. *Id.* at 38, 40. Toward the end of the academic year, the parents sought to have the IEP reviewed. *Id.* at 38. When revision was unsuccessful, the child's parents placed him in a private school and requested a due process hearing. *Id.* at 39. In the due process hearing, the classifying officer (playing a role analogous to that of the ALJ here), agreed that the IEP had failed:

> [The IEP] failed to specify clearly the educational goals and objectives . . . [and] the manner of measuring [] progress . . . [T]he evaluations . . . were subjective. Objective test scores indicated that [the student] had failed to progress in [multiple categories] . . . [T]he five goals set forth in the . . . IEP were incapable of objective measurement and . . . [the district] probably had not intended [the student's] mastery of those goals.

*Lascari*, 116 N.J. at 39–40.

After some shuttling between tribunals, the trial court dismissed the parents' complaint. *Id.* at 42. In doing so, the trial court incorrectly stated that the parents had a burden "to prove that the School District was not able to provide an appropriate education." *Id.* The Appellate Division affirmed the dismissal, but the New Jersey Supreme Court reversed.

The New Jersey Supreme Court, to begin with, clarified that the school district, not the parents, bears the burden of proving that the IEP was appropriate. *Id.* at 44; *see also* N.J. Stat. Ann. § 18A:46-1.1 (codifying the

*Lascari* decision that the burden is placed on the district). It then held that, "in determining whether an IEP [is] appropriate, the focus should be on the IEP actually offered and not on one that the school board could have provided if it had been so inclined." *Id.* at 46. "In short, a school board that has failed to meet its obligation to provide an appropriate education should not escape liability by showing that it could have done so." *Id.* at 47 (1989).

Here, the Parents argue that *Lascari* prohibited the ALJ from relying on Ms. Pane's testimony that the IEP would be reviewed in 30 days, after testing. (DE 19, 25). The ALJ, the Parents argue, could only judge the IEP by what appears on the face of the document.

The circumstances here are entirely different from those in *Lascari.* In *Lascari*, the school district implemented an IEP which did not account for the child's actual needs, and which failed to produce results after being tried for an entire school year. *Lascari*, 116 N.J. at 38. Here, by contrast, at the outset of SS's enrollment, the District simply made provision for further evaluation and promulgated a 30-day IEP for a student who had not yet arrived in the District, based on the information available at the time. The District explicitly provided for further testing and appropriate revisions at the earliest practical opportunity. (ALJ Op. 53). That is a far cry from the year-long failure in *Lascari*, which justified the parents in removing the child.

The Parents argue that the ALJ, like the classifying officer in *Lascari*, has admitted that the IEP was inadequate. True, the ALJ acknowledged that the special considerations section of the IEP does not address SS's communications needs or behavioral impediments to learning. (ALJ Op. 25). In the very same sentence, however, the ALJ finds *no issue* with the special considerations section because SS's communication needs and behavior "are obvious considerations . . . and those considerations are noted elsewhere in the IEP." (ALJ Op. 53). *See* 34 C.F.R. § 300.320(d)(2) ("Nothing in this section shall be construed to require . . . [t]he IEP Team to include information under one component of a child's IEP that is already contained under another component

of the child's IEP."). Unlike the officer in *Lascari*, the ALJ here determined that the IEP was satisfactory, not that it had been tried and had failed. *See* (ALJ Op. 57) (concluding that "the District's IEP was appropriate to meet [SS]'s educational needs . . . and was reasonably calculated to provide him with FAPE and a meaningful educational benefit"). Statements that this newly-enrolled student's IEP would be promptly revised in light of further testing and information are not admissions of failure.

### 6. Comparing the District's program to SEARCH

Next, I consider the Parents' argument that the ALJ violated applicable law when it evaluated the District's program in comparison to that of SEARCH, the school at which the Parents placed SS (DE 19, 26–27). The Parents assert that "the law is clear when a judge is determining FAPE they cannot compare the District program with the unilateral placement." (DE 19, 26 (citing *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 271 (3d Cir. 2003)). That assertion is a mischaracterization of precedent.

In *S.H.*, the school district's first IEP placed a disabled child in a public school, but the school district revised the IEP the next year and placed the child in a different public school. *Id.* at 266. The child's parent contested the placement at the second public school. *Id.* To determine whether the revised IEP's placement was appropriate, the Third Circuit explained, "the issue is not a comparison between the [first public school] and the [second public school]. The IDEA does not require the School District to provide [the student] with the best possible education." *S.H.*, 336 F.3d at 271. The standard requires that the actual IEP be appropriate and provide a meaningful benefit, not that it be better than the program available at some other public school. Still less does IDEA require that an IEP measure up to that of whatever private school the parents may select. That said, *S.H.* does not generically rule out consideration of programs or test results merely because they derive from other schools.

In reaching its decision that the IEP was appropriate, the ALJ considered, among many factors, that the Parents' selected program at

SEARCH uses a testing process and IEP preparation process similar to that of the District. This is not the kind of comparison (*desired* by the parents in *S.H.*, by the way) that was rejected by *S.H.* The ALJ's Opinion comments on the SEARCH process but does not set up a choice of which school's IEP is better. Rather, the ALJ made the comment in support of a finding that the 30-day, revisable IEP (as far as it got before the Parents withdrew SS from the school) was appropriate.[16]

### 7. *E.S. v. Parsippany Troy Hills Board of Education*

The Parents argue that the ALJ Opinion failed to apply applicable law because it "strayed from a previous similar ruling against the same school district . . . where [the same ALJ] found on behalf of the parents." (DE 19, 27) (citing *G.S. and N.M. on behalf of E.S. v. Parsippany Troy Hills Board of Education*, OAL Docket No.: EDS-13568-15). The ALJ, however, cited and distinguished the *G.S.* case; she found that the Parents' "reliance upon *G.S.* is unavailing, as *G.S.* is distinguishable for many reasons, including, *inter alia*, the child's age and disabilities, the nature and extent of available evaluations, and the testimony and credibility of the experts." (ALJ Op. 56; *see also G.S. and N.M. on behalf of E.S. v. Parsippany Troy Hills Board of Education*, *supra*.) Different facts, different results; the ALJ was not bound here to reach the same decision as in *G.S.*

### 8. Procedural violations

The Parents argue that the ALJ failed to consider procedural violations that were established by the record. (DE 19, 29). According to the Parents, the ALJ "ignored applicable New Jersey Special Education Code Statutes all together when making her determination that the District did not commit any procedural violations that rose to the level of a denial of FAPE." (DE 19, 33).

---

[16]     The Parents also argue that the ALJ's comparison also violated *Lascari* because it looked outside the four corners of the IEP. (DE 19, 26 (citing *Lascari v. Bd. of Educ. of Ramapo Indian Hills Reg'l High Sch. Dist.*, 116 N.J. 30 (1989)). For the reasons discussed in Section III(A) (5), *supra*, I reject the Parents' overbroad interpretation of *Lascari*.

For the most part, the Parents simply take their substantive objections (discussed elsewhere in this opinion), and recast them as procedural objections by stating that the ALJ "ignored" them (which she did not).

The Parents cite N.J.A.C. 6A: 14-2.7(k), which governs the due process hearing:

> [A]n administrative law judge may decide that a child did not receive a FAPE only if the procedural inadequacies: (1) impeded the child's right to a FAPE; (2) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of FAPE to the child; or (3) caused a deprivation of educational benefits.

*Id.* The ALJ cited and applied the federal equivalent of the New Jersey due process hearing rules. (ALJ Op. 50 (citing 20 U.S.C.A. § 1415(f)(3)(E)(ii)). And as the ALJ correctly points out, "not all procedural violations amount to a substantive deprivation of FAPE." (ALJ Op. 50); *see also H.M. ex rel. B.M. v. Haddon Heights Bd. of Educ.*, 822 F. Supp. 2d 439, 453 (D.N.J. 2011) ("[N]ot only must there be a procedural violation, that violation must result in a loss or deprivation of a substantive right."). I therefore turn to the five procedural violations alleged by the Parents, and consider whether any prejudice resulted.

First, the Parents allege that "the District failed to conduct any evaluations that were relevant to SS's behavior issues and issues related to Autism." (DE 19, 31).[17] Second, the Parents allege that "no one that evaluated SS had knowledge of Autism, his area of suspected disability." (DE 19, 31).[18] My response is short: if SS had started the District's program, a BCBA or other person with knowledge of Autism could and no doubt would have participated in SS's Autism-specific and behavioral testing. As the ALJ found, the ALLS-R and FBA tests were to be conducted when SS started school in the District.

---

[17]   Under 34 C.F.R. § 300.304(c)(4), regarding evaluation procedures, "each public agency must ensure that . . .the child is assessed in all areas related to the suspected disability."

[18]   Under N.J.A.C. 6A:14-2.5(b)(6), "[a] minimum of one evaluator shall be knowledgeable in the area of the suspected disability."

(ALJ Op. 50–52) ("The District conducted those evaluations that could reasonably be conducted prior to [SS] starting the District's program, but it was clear from the testimony that the ABLLS-R and an FBA would be conducted upon starting the program.").

Next, the Parents argue that the ALJ ignored the District's failure to accede to the Parents' request that SS be given intensive one-to-one ABA instruction, additional support, and home instruction. (DE 19, 31). The District's evaluation and denial of their request, say the Parents, omitted reference to the BACA report and Milestones data they had supplied. (DE 19, 31–32). However, "[t]he fact that the child study team ultimately disagreed with [the] parents does not mean that the parents were denied meaningful participation." *L.G. v. Fair Lawn Bd. of Educ.*, No. 2:09-CV-6456 DMC, 2011 WL 2559547, at *5 (D.N.J. June 27, 2011), *aff'd*, 486 F. App'x 967 (3d Cir. 2012). The Parents are partners in the IEP process, but "[i]f the standard for measuring meaningful parental participation was that the parents always prevailed, there would be no process at all." *Id.* The ALJ notes that the District provided the Parent with both the draft and revised IEP, and that it knew and documented parental concerns. The ALJ further addresses the Parents' criticism that the District relied on the Mitchell's Place IEP instead of the data from Milestones. (ALJ Op. 51). Finding no procedural violation, the ALJ highlights that the Mitchell's Place IEP was the last IEP SS had prior to registering with the District. (*Id.*) The ALJ further notes that SS had only attended Milestones for a month. (*Id.; see also* Section III.A.2, *supra*). In sum, the ALJ did address the alleged procedural violation; the Parents are simply dissatisfied with the result.

Next, I consider the Parents' argument that the ALJ ignored the fact that the District's BCBA's did not participate in the development of the IEP and that the members of the CST testified that they were not experts in Autism or ABA. (DE 19, 32). First, "20 U.S.C. § 1414(d)(1)(B) provides a list of those individuals who must participate in designing an IEP; an expert on the child's specific

33

disability is not required." *Rodrigues v. Fort Lee Bd. of Educ.*, 458 F. App'x 124, 127 (3d Cir. 2011).[19] The Parents cite to no code, regulation, or case law to support the assertion that a CST member must be an expert in the child's disability. Still, I note that the ALJ found that at least one BCBA was involved the IEP development process. (ALJ Op. 52).[20]

I next address the Parents' argument that the ALJ ignored the fact that "the District failed to have anyone with knowledge of Autism or even the districts program attend the IEP meeting." (DE 19, 32). The complaint is that no one at the IEP meeting was equipped to interpret the evaluations the Parents gave to the District. (DE 19, 32 (citing N.J.A.C. 6A:14-2.3(k)(2)(iv)); *see also* 20 U.S.C. § 1414(d)(1)(B)(v). And it is true that, while an IEP team member need not be an expert in the child's disability, the IEP team must include "[a]t least one child study team member who can interpret the instructional implications of evaluation results." 20 U.S.C. § 1414(d)(1)(B)(v); *see also* N.J.A.C. § 6A:14-2.3 (k)(2)(iv).

The ALJ made no explicit finding regarding the special qualifications of the attendees at the IEP meeting. However, the ALJ does note the following:

> [T]o suggest that the CST did not have adequate training or information to determine that [SS] required an ABA program or to place him in the District's autism ABA program is inconsistent with the volume of information provided to the District, some even prior

19    Post-2011 amendments to 20 U.S.C. § 1414(d) have not altered the list of the individuals who must participate in designing an IEP. *Compare* 20 U.S.C.A. § 1414 (2005), *with* 20 U.S.C.A. § 1414 (2016).

20    Pane testified that she reviewed [SS]'s MP IEP and another interdisciplinary report approximately two weeks prior to [SS]'s visit to Rockaway Meadow School, and it included many benchmarks or objectives based on the VBMAPP. Based upon the documentation, the District was aware that [SS]'s maladaptive behaviors would have to be addressed. Pane testified that another behavior analyst, Gina Orsini, had provided some assistance with goals and objectives, and Pane told Orsini to be sure the IEP provided for an FBA to be conducted, which it does.

(ALJ Op. 52).

to enrollment, and is inconsistent with the IEP, which in fact reflects that [SS] requires an ABA program.

(ALJ Op. 50).

Assuming *arguendo* that the Parents have identified a procedural violation, they have failed to demonstrate that any such violation impeded SS's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process, or deprived SS of educational benefits. *See* N.J.A.C. 6A: 14-2.7(k). Reaching my decision, I consider the IEP process as a whole—not just the sliver of the pre-unilateral-placement process cited by the Parents.

### B. ALJ's Determinations of Credibility and Fact

The Parents argue that the ALJ failed to make proper findings of fact and credibility related to: (1) the Wiedemann testimony; (2) the appropriateness of the IEP and the District's program; and (3) whether Ms. S was uncooperative.

### 1. Wiedemann Testimony[21]

First, I consider the Parents' argument that the ALJ erred in finding that Wiedemann did not have an opinion as to whether the District's IEP was inappropriate. (DE 19, 38). The Parents cite page 11 of the ALJ Opinion, but nowhere on page 11 does the ALJ discuss Wiedemann. A a discussion of Wiedemann's testimony does occur later, however, and I will assume that the Parents intended to refer the ALJ's statements that (1) Wiedemann testified that she "was not sure if the program would be appropriate for [SS] because she was not 100 percent sure what she was looking at," (ALJ Op. 35); and (2) Wiedmann "had not rendered a professional opinion about whether the District's IEP was appropriate for [SS] or whether the goals and objectives were appropriate for [SS]" (ALJ Op. 38).

---

[21]    At the end of the Wiedemann testimony section, the Parents tack on an argument that the ALJ was biased because the legal analysis of the ALJ opinion cherry-picked facts and disregarded District testimony that the IEP was inappropriate. I discuss that argument together with the other allegations of bias in Section III.C, *infra.*

As to the first, the record demonstrates that the ALJ opinion accurately describes Wiedemann's testimony:

[Question]: Okay. And were you able to glean whether or not this particular program would be appropriate for [SS]

[Answer]: I wasn't sure, because I wasn't really 100 percent sure what I was looking at.

(3T 151:17–21; compare ALJ Op. 35.)

As to the second reference, however, the ALJ's statement is not supported by the record. Ms. Wiedemann did not fail to offer an opinion, but did in fact state that the District's IEP was not appropriate. (P-11, 18).[22]

Otherwise, however, the ALJ accurately describes Wiedemann's testimony. And elsewhere in the Opinion, in her legal analysis, the ALJ recognizes Wiedemann's opinion that the IEP was not appropriate:

Wiedemann testified that part of her reason for stating that the goals and objectives in the IEP were **inappropriate** was that she felt that the IEP lacked certain goals, primarily goals to address maladaptive behaviors.

(ALJ Op. 53) (emphasis added). After reviewing the record, I will set aside the ALJ's inconsistent statement that Wiedemann did not render a professional opinion of the District's IEP. In the context of all the evidence, discussed herein, I find any mistake to be harmless.

## 2. An appropriate IEP and program

Next, I consider the Parents' arguments that the ALJ failed to make credible fact determinations about the IEP proposed by the District. First, the Parents argue that the ALJ ignored evidence that the District's proposed program was not an ABA program and that the District did not provide an intensive ABA program. (DE 19, 35). Supporting that argument, the Parents also assert that the frequency and duration of one-to-one services and a

---

[22]     The ALJ was perhaps thinking of Wiedemann's statements that she did not render a professional opinion as to whether the *Mitchell's Place* IEP or the goals and objectives of the *Mitchell's Place* IEP were appropriate. (3T 251:15–253:8).

behavioral program were not included in the IEP. (DE 19, 35). Second, they argue that the ALJ disregarded testimony by Pane, the District's expert, that the proposed IEP had several deficiencies: (1) the goals were not objective or measurable; (2) the frequency and duration of services was not included; (3) components of the program were not included; and (4) it included group learning. (DE 19, 35). Third, they argue that the ALJ disregarded testimony that an appropriate program should not include speech and occupational therapy. (DE 19, 36). Fourth, the Parents argue that the ALJ did not consider that the proposed IEP did not include a behavioral plan. (DE 19, 36).

I consider whether the ALJ ignored evidence that the District's program is not ABA and that the District did not provide an intensive ABA program as allegedly required. As discussed in Section III.A.2, *supra*, the ALJ correctly determined that FAPE standards did not require that the District implement the particular intensive ABA program in place during SS's brief sojourn at Milestones. The ALJ did not "ignore" testimony that the District's program is not ABA. Rather, the ALJ considered the Parents' witnesses and reports, found them less convincing than other evidence, and justified her decision. (ALJ Op. 52–56). For example, the ALJ credited the testimony of Pane to note that the frequency and duration of one-to-one services was not in the IEP because it is part of the autistic program. (ALJ Op. 51). In addition, the ALJ credited Pane's testimony that an FBA would be conducted to address SS's behaviors. (ALJ Op. at 53). I defer to the ALJ's credibility determination regarding Pane's testimony. Absent sufficient contrary evidence, which I do not find here, I am bound to defer.

I consider the Parents' contentions that the ALJ ignored evidence of deficiencies in the proposed IEP. Such complaints are, to a great extent, superseded by the ALJ's finding that the District IEP was properly based on the Mitchell's Place IEP initially, and would be developed further after SS started the program. (ALJ Op. 52–57. *See also* Section III.A.2, *supra*.) After listening to and weighing all of the evidence (*see* 2T), the ALJ ultimately credited Pane's testimony that the IEP was adequate. (ALJ Op. 51–54). That the ALJ was

entitled to do. Here, the Parents have not set forth convincing extrinsic evidence that the ALJ erroneously reached credibility determinations on the evidence presented.

On review, I find that the ALJ did consider all of the presented evidence on the appropriateness of the IEP and the District's program. The ALJ took testimony from eight witnesses, weighed the testimony of each, and reviewed dozens of underlying exhibits. (ALJ Op.). To be sure, the Parents disagree with the ALJ's conclusions. That is not to say, however, that she ignored evidence or failed to conscientiously perform her fact-finding function.

### 3. Ms. S as "uncooperative"

The Parents' argument that the ALJ wrongfully found Ms. S to be "uncooperative"[23] does not cite to the record. (DE 19, 20, 36–37). I do not find any such statement in the discussion of the non-testimonial evidence or the testimony of Ms. S. (ALJ Op. 42–46). I will assume that the Parents are referring to the ALJ's analysis at page 57 of the Opinion. There, discussing the unreasonableness of the Parents' having unilaterally placed their son at SEARCH, the ALJ states as follows:

> There was no documentation or testimony that the parents requested that any additional or more specific information about the ABA program or behavioral interventions be included in the IEP, and while they had previously shared numerous evaluations and documents with the District, other than the parents' observation of the classroom subsequent to the IEP meeting, it appears that **any collaborative process ended upon the parents learning that the District was proposing an in-District placement, rather than a private school**, and there was no further interaction between the District and the parents after May 24, 2016. The core of the IDEA is the cooperative process that it establishes between parents and schools.

(ALJ Op. 57 (emphasis added (citing *Schaffer v. Weast*, 546 U.S. 49, 53 (2005)).

---

[23] This argument is offered in support of an allegation that the ALJ was biased. I address related allegations of bias at Section III.C, *infra.*

This was not some sort of blanket finding that Ms. S was "uncooperative." Rather, the ALJ concluded that the Parents stopped engaging with the District and unilaterally placed the child at SEARCH when it appeared that a private school placement was not in the offing. The ALJ duly acknowledged, however, that until that point, the Parents were cooperative. The ALJ Opinion notes, for example, that Ms. S provided the District with an abundance of information and supporting documents about SS's education. (ALJ Op. 57; see, e. g., R-27, R-29, R-40, R-41, R-50.). Based on the evidence of record, the ALJ found the unilateral placement to be premature and unreasonable, because it did not permit the District to complete its evaluation. That was a permissible finding, which did not rely on some implicit judgment about Ms. S's character or cooperation.

I will address, however, the related point that the ALJ misinterpreted Ms. S's attitude and actions, and therefore misjudged her credibility. What the ALJ missed, according to the Parents, was that Ms. S understandably "shut down" after an offensive comment allegedly made by Landesberg in the meeting on May 24, 2016. (DE 19, 37; 4T 222:13–223:18). The ALJ Opinion, however, does not ignore but explicitly notes Ms. S.'s testimony that she shut down after Landesberg "said that at [SS's] current functioning level, he could eventually find a job stirring or making beds." (ALJ Op. 45–46).

Such a comment, if made, was at best inappropriate and insensitive; no parent could be blamed for taking offense at it. The record before me, however, does not demonstrate that the ALJ penalized Ms. S for taking offense or that she discounted Ms. S's truthfulness based on her reaction. Indeed, it does not appear that Landesberg's comment was what derailed the collaborative process.[24] In any event, the ALJ could rightly have concluded that a single

---

[24]    Mom did not share any concerns about the proposed program at the IEP meeting, though she testified that it was because she did not have enough information. The draft IEP did not include speech therapy or occupational therapy, and it did not include goals and objectives, and several of the District's reports had not been included. However, a revised IEP was emailed to Mom on May 24, 2016, after the tour and meeting at Rockaway Meadow School that

offensive comment did not exempt the Parents from the collaborative process or entitle them to unilaterally place the child in private school.

The Parents have not met their burden to demonstrate that the ALJ's findings in relation to the unilateral placement were infected by a wrongful credibility determination or an erroneous perception that Ms. S was "uncooperative."

### C. Bias

Finally, I address the Parents' argument that the ALJ evinced bias against the family. (DE 19, 20, 36 – 37). Such bias, if demonstrated and found sufficient, might violate the due process right to an impartial hearing. *Withrow v. Larkin*, 421 U.S. 35, 46 (1975) ("[A] 'fair trial in a fair tribunal is a basic requirement of due process . . .[t]his applies to administrative agencies which adjudicate as well as to courts."); *Grant v. Shalala*, 989 F.2d 1332, 1345 (3d Cir. 1993) ("We fully recognize that bias on the part of ALJs may undermine the fairness of the administrative process."). "[H]earing officers are provided a presumption of impartiality unless a plaintiff is able to demonstrate that they have 'display[ed] deep-seated favoritism or unequivocal antagonism that would make fair judgment impossible.'" *McKean v. Colvin*, 150 F. Supp. 3d 406, 412 (M.D. Pa. 2015 (citing *Liteky v. United States*, 510 U.S. 540, 555 (1994)); *see also Thomas v. D.C.*, 407 F. Supp. 2d 102, 109 (D.D.C. 2005) ("[The] Hearing Officer enjoys a presumption of honesty and integrity, which is only rebutted by a showing of some substantial countervailing reason to conclude that a decisionmaker is actually biased with respect to factual issues being adjudicated.").

To a great extent, however, this argument simply repeats the Parents' substantive legal and factual objections, and asserts that such errors could

---

included all of the foregoing. Mom testified that she was unable to open the file, but she never advised the District that she was unable to open the file, and that she expected the IEP would essentially be the same as the Draft IEP.

(ALJ Op. 51. The Opinion generically refers to Ms. S as "Mom.")

only be attributable to bias. For the reasons expressed above, however, these were not errors at all.

The Parents state that the ALJ showed "unequivocal bias in favor of the District by relying on unsupported testimony by the district employees . . . by concluding the parent was uncooperative in direct contradict of all testimony from all witnesses . . . [and by choosing] to highlight only facts favorable to the district." (DE 19, 20). Furthermore, the Parents assert that the ALJ's treatment of them inexplicably departed from her treatment of a different family in another case against the District. (DE 19, 29 (citing *G.S. and N.M. on behalf of E.S. v. Parsippany Troy Hills Board of Education*, OAL Docket No. EDS-13568-15)). For the reasons stated below, these contentions do not, individually or collectively, overcome the presumption of impartiality.

First, as discussed in Section III.B.3, *supra*, I reject the Parents' argument that the ALJ found Ms. S uncooperative and therefore demonstrated "unmistakable bias." (DE 19, 20).

Second, the Parents do not provide support for their argument that the ALJ relied on unsupported testimony from District employees and ignored the Parent's contrary evidence. (DE 19, 20). In the section regarding fact determinations, I have concluded that the ALJ treated the evidence properly and made appropriate factual findings. *See* Section III.B, *supra.*

Third, I consider the argument that the ALJ's legal analysis "cherry-picked . . . facts to support allowing the district to fix the IEP only after the parents signed it and district did additional testing." (DE 19, 39). It is true, of course, that an ALJ must consider the entire record and may not "'cherry-pick' only that evidence that supports her position." *Griffith v. Astrue*, 839 F. Supp. 2d 771, 783 (D. Del. 2012) (citing *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (finding that an ALJ did not give proper weight to a medical opinion when the ALJ "chose instead to draw his own medical conclusion based solely on a credibility determination and the pieces of the examination reports that supported this determination.")). For the reasons stated above, I reject this as a

general characterization of the ALJ's Opinion.[25] To some degree, the Parents seem to be quibbling that not everything in the factual findings is reprised in the ALJ's legal analysis. I cannot conclude from this that the ALJ was biased.

Finally, I address the argument that the ALJ is biased here because she found in favor of the parents in a prior case, *G.S. and N.M. on behalf of E.S. v. Parsippany Troy Hills Board of Education*, OAL Docket No.: EDS-13568-15. As discussed, I reject the Parents' assertion that the ALJ was bound to *G.S.* or that the case was not distinguishable. See Section III.B.7, *supra.*

## IV.  Conclusion

For the reasons set forth above, I will affirm the ALJ's Opinion. I therefore **DENY** the Parents' motion for summary judgment and **GRANT** the District's motion for summary judgment.

An appropriate order follows.

Dated: December 18, 2018

**Kevin McNulty**
**United States District Judge**

---

[25]     The Parents here refer to alleged procedural violations, issues with the IEP, and issues with the District program (DE 19, 38–39), the matters discussed substantively above.